**Robert WESENER, Petitioner–Appellant,**

v.

**Dennis STRAUB, Warden, Respondent–Appellee.**

**No. 02–2402.**

United States Court of Appeals, Sixth Circuit.

Sept. 16, 2004.

**616**

Before GUY and SUTTON, Circuit Judges; and CARR, District Judge.*

PER CURIAM.

Petitioner, Robert Wesener, a Michigan prisoner, appeals from the denial of his petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. A certificate of appealability was granted as to three of petitioner's five claims, all of which relate to possible bias of the complaining witness, Christine Clark. Clark was herself a suspect in several burglaries at the time of petitioner's trial, and no charges had yet been filed.

Petitioner claims he was denied his right to fair trial and due process as guaranteed by the Sixth and Fourteenth Amendments: (1) "where he was denied his right to present a defense where the court improperly excluded independent evidence that showed bias of the complaining witness, who was testifying against petitioner to obtain dismissal of a felony charge against her or with an expectation of leniency"; (2) "where the prosecutor and his complaining witness deliberately misl[ed] the jury and the court as to bias and the witness' expectation of leniency in return for her testimony"; and (3) "where the prosecutor's office intentionally arranged to have charges against the complaining witness withheld until after petitioner's trial so as to give the appearance that the complaining witness had no bias or self interest in testifying at petitioner's trial."

The district court denied habeas relief on the first claim finding that although the exclusion of testimony from Clark's jailhouse acquaintances violated petitioner's right to confrontation, the error was harmless under *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). As for the second claim, the district court found no hearing was required because even if petitioner could establish that Clark had been promised leniency, petitioner would not be entitled to habeas relief. Finally, the district court found the third claim was procedurally defaulted and that there was no basis to find petitioner could demonstrate actual innocence or establish cause and prejudice to excuse the default. After a review of the record and the applicable law, we affirm the denial of habeas relief on these claims.[1]

### I.

The charges against petitioner and codefendants James (Jamie) Cushman and Gerald (Jay) Coeur arose out of a protracted assault on Christine Clark that occurred on December 25, 1993. After a joint trial, petitioner was convicted on three counts of first degree criminal sexual conduct (CSC), one count of aggravated assault, and one count of possession of a firearm during the commission of a felony (felony firearm). He was acquitted of kidnapping and assault with intent to murder. Petitioner was sentenced to concurrent sentences of

---

* The Honorable James G. Carr, United States District Court for the Northern District of Ohio, sitting by designation.

1. Although petitioner's pro se brief on appeal simply restates the issues presented, his application for writ of habeas corpus fully sets forth the facts and arguments on which his claims are based.

17–30 years' imprisonment for the CSC counts and one year for aggravated assault, to be followed by a consecutive two-year term for felony firearm.

Clark, a crack cocaine user and prostitute, drove to petitioner's house on December 25, 1993, to borrow money. Clark knew petitioner because he had paid her to perform oral sex on him a number of occasions during the previous year. The district court summarized the evidence concerning the assault as follows:

> Ms. Clark testified that she was riding around with a man named Charlie Jackson the night before the incident. She was "turning tricks," or performing acts of prostitution, to obtain money to buy cocaine. Ms. Clark testified that she also went to petitioner's house at about 4:00 a.m. to borrow money and then returned at about 11:00 a.m. the same day to borrow more money at which time petitioner attacked her. Ms. Clark testified that a fellow prostitute and friend of hers named Vicky had committed the break-in and robbery at James Cushman's home which petitioner accused her of committing.

> Petitioner confronted Ms. Clark shortly after she arrived at his house around 11:00 a.m. and accused her of burglarizing his home and James Cushman's home and stealing various items including cash, a collection of unusual coins and bills, such as silver certificates; a VCR, jewelry, clothing, and some wrapped Christmas presents. Petitioner testified that he grabbed Ms. Clark, threw her against a wall, and punched her several times. Petitioner testified that Ms. Clark was armed and that he took a pistol from her during the incident. Ms. Clark testified that she told petitioner that she was pregnant, but he replied that he did not care and she was going to die. Petitioner testified that

Ms. Clark began bleeding after he punched her and he pushed her into the kitchen to keep her from bleeding on his carpet.

> Ms. Clark testified that petitioner kept hitting and kicking her in the kitchen. Petitioner was wearing cowboy boots. Ms. Clark testified that James Cushman put the barrel of a black semiautomatic pistol in her mouth and said Christmas was a nice day to die. Ms. Clark testified that petitioner was carrying a revolver with no grips on the handle and that he hit her on the head with this gun. Ms. Clark identified both of these guns at trial. Ms. Clark testified that two M–80s, very large and powerful firecrackers, were put in her mouth with the fuses sticking out. Defendant Cushman acted like he was going to light the fuses by firing his gun near them. However, Cushman did not fire his gun and the M–80s were not detonated. Ms. Clark testified that the M–80s disintegrated in her mouth and she spit them out. Ms. Clark also testified that she was threatened with a scoped long gun which petitioner pointed at her.

Petitioner admitted that he ordered Ms. Clark to take her clothes off and that he bound her wrists and ankles with duct tape. Petitioner testified that he did so to prevent Ms. Clark from escaping so that he and his co-defendants could drive her to the police station after making a citizens' arrest on suspicion of burglary. Petitioner testified that he did not call the police and have them come to his house because he was expecting company later and did not want the police around while he had company. On cross-examination, petitioner admitted that the company never came. Petitioner testified that he called his company and told them not to come

over, but still did not call the police to investigate the alleged burglary.

Ms. Clark testified that, after she was naked and bound with duct tape, and had been beaten and threatened with guns, petitioner made her stick a long necked Budweiser beer bottle in her vagina and her anus. Ms. Clark testified that petitioner told her that if she did not do it herself, he would kick it up inside her.

Gerald Coeur testified that petitioner forced Ms. Clark to empty her pockets while she was still dressed and that petitioner found a dollar bill which petitioner exclaimed had been part of Jamie Cushman's silver certificate collection.

Ms. Clark testified that Jamie Cushman forced her to stick this dollar bill inside her vagina.

Ms. Clark further testified that she performed oral sex on Gerald Coeur during the incident while guns were being pointed at her head. Ms. Clark had previously stated that she had not had sexual contact with any of the three codefendants except petitioner. The emergency room treating physician testified that, when Ms. Clark told him about the incident, she had not mentioned performing oral sex on anyone, or having had anyone put a penis in her mouth during the incident.

Ms. Clark testified that petitioner forced her to repeatedly shock herself on her nipples and inner thighs with electric wires coming from a black box. Petitioner admitted threatening to shock Ms. Clark, but he denied actually doing it. Petitioner testified that he was a licensed and certified sign hanger. He asked Ms. Clark if she would like to glow like a neon sign. Ms. Clark was also wrapped in aluminum foil to increase the effects of being shocked. Ms. Clark testified that petitioner later stuck a long pointed rifle cartridge in her anus while he was wearing green gloves.

James Cushman admitted that he dripped melted candle wax on Ms. Clark. Ms. Clark testified that he told her while holding a Ginsu kitchen knife that she had to cut off one of her nipples or else he would. Mr. Cushman denied making this threat. Ms. Clark was not cut with a knife or any other object. Mr. Cushman also admitted urinating on Ms. Clark's head. He attempted to minimize this by claiming "I just kind of dribbled on her a couple of times.... I urinated on her, but it was just a few dribbles. It wasn't like I just stood there and peed all over her." Mr. Cushman also admitted brandishing a gun at Ms. Clark and remarking to her that he should shoot her. Mr. Cushman testified that he worked at a video game arcade and collected unusual coins and bills which customers brought there, such as silver dimes and quarters, two dollar bills, and silver certificate bills.

Petitioner eventually told Ms. Clark to get dressed. Ms. Clark testified that petitioner told her that it was time to die, loaded his revolver, and forced her to get into a car. Ms. Clark testified that she and petitioner were the only people in the car. Ms. Clark thought that James Cushman was supposed to follow in another vehicle. Petitioner drove and she was the passenger. While driving towards the Titabawassee River, petitioner stopped the car at a traffic light. Ms. Clark jumped out of the car, ran to a 7-Eleven convenience store, and asked for help.

The police were summoned and Ms. Clark was taken to the hospital where she was examined, photographed, and treated. The medical examination and photographs showed candle wax on Ms. Clark's head, residue from duct tape on

her wrists and ankles, contusions and lacerations of her scalp, two black eyes, and other wounds on her body. Part of a dollar bill was found in her vagina during a pelvic examination in the emergency room. The doctor who examined and treated Ms. Clark in the emergency room testified that she told him she had been forced to "use" a bottle on herself. There was no tearing or swelling of her anal or vaginal areas. The doctor testified that a bottle could be inserted in these areas without causing injury if it was done carefully. There was no testimony that evidence of electrical burns was found on Ms. Clark's nipples, thighs, or anywhere else. The doctor testified that electric shock and even electric burns may occur without leaving any marks or other evidence where the electricity entered or exited.

When petitioner's house was searched, several guns including a revolver with no hand grips, silver duct tape, aluminum foil, black electrical boxes, electrical extension wires with the wires cut, a pair of green gloves, a green candle, some melted candle wax, and some long-necked beer bottles were found. There was no testimony regarding whether or to whom the revolver without grips may have been registered. There was no testimony regarding any long bullet or bullets or M–80 firecrackers having been found. No rifle bullets or residue of M–80 firecrackers were admitted into evidence. Forensic examination of the bottles revealed the likely presence of bodily fluids other than saliva on the outside of one bottle and the probable presence of feces inside the same bottle.

Petitioner testified that no one ever put a M–80 in Ms. Clark's mouth or a rifle cartridge in her anus. Petitioner testified that he was very mad at Ms. Clark because he believed she was responsible for burglarizing his house.

Petitioner testified that he told Ms. Clark to undress because he had discovered a gun on her and wanted to be sure she had no more weapons. Petitioner said that he duct taped Ms. Clark to prevent her from escaping before he could take her to the police as a burglary suspect. Petitioner denied ordering Ms. Clark to abuse herself with the beer bottle. Petitioner testified that, when he confronted Ms. Clark with accusations that she had burglarized his home and told her that he was going to take her to the police, Ms. Clark began offering to have sex with him if he would let her go. Petitioner said that he refused these unwanted sexual advances and threw a beer bottle at Ms. Clark, telling her to use the beer bottle if she wanted to have sex. Petitioner testified that Ms. Clark began touching herself with the beer bottle and continued offering him sex in exchange for letting her go to arouse him and escape burglary accusations. Petitioner said that any contact between Ms. Clark's sexual organs and/or anus and rectum and the beer bottle which took place was at her own voluntary initiative.

Petitioner admitted on cross-examination that he solicited Ms. Clark for sex the first time he met her, and that during the Christmas Day incident he called her names, including a "thieving bitch," hit her repeatedly, ordered her to take off her clothes, and duct taped her hands and wrists. Petitioner also testified that Ms. Clark was in the kitchen for about three or four hours during the incident and that she did not try to get away or escape during that time. When asked on cross-examination if he was asking the jury to believe that Ms. Clark remained in his kitchen for three or four hours because she wanted to stay there,

petitioner replied, "[y]es, I can believe that."

Petitioner testified that Ms. Clark got into his vehicle voluntarily and that he drove away from his home with her in the car, intending to drive her to a police station. Petitioner admitted that, when Ms. Clark ran away from the car, he did not wait outside the 7–Eleven to attempt to recapture her and take her to the police station. Nor did he call the police and wait for their arrival, or stay at the 7–Eleven to see if the police might be summoned so that he could report his burglary allegations to them. Instead, petitioner drove away in the car, abandoned it in front of an unknown person's home, and returned to his home on foot. Petitioner denied that Ms. Clark looked as bad when she ran away from the car as she did in the photos taken at the hospital. Petitioner acknowledged, however, that there was no reason to believe that she had been beaten by 7–Eleven employees, the police, the ambulance attendants, or the hospital personnel who treated her injuries.

There was evidence that Clark had a prior felony conviction for breaking and entering a car. On cross-examination, Clark testified that she had no pending cases or breaking and entering charges at the time of petitioner's trial; that she had not discussed her involvement in a break-in at Shack's Lounge with the prosecution; and that the prosecution had not made her any promises about any cases or anything else. On re-direct, the prosecutor asked her whether any promises had been made for her or things done for her to get her to testify. Clark replied that nothing was done for her.

In an attempt to impeach Clark, petitioner called two women who had been housed with Clark before trial, Edie Chaltraw and Melinda Hammond. Clark, who had failed to appear for the first trial date, was being held on a material witness warrant. The trial judge ruled, concededly in error, that MRE 613(b) mandated that extrinsic evidence of Clark's prior inconsistent statements could not be introduced because she was not given an opportunity to explain or deny the statement. On direct appeal, the Michigan Court of Appeals found the error was harmless in light of the evidence, including forensic evidence, against petitioner.

The district court summarized the testimony from Chaltraw and Hammond, most of which was received on a separate record, as follows:

Edie Chaltraw testified before the trial court in a separate record that she had been in the Saginaw County Jail for contempt of court for failing to pay a traffic ticket at the same time Ms. Clark was being held there as a material witness. Ms. Chaltraw further testified that Ms. Clark indicated to her that she (Ms. Clark) was being held on a breaking and entering charge or was a suspect in a breaking and entering case at the time of petitioner's trial.

Melinda Hammond testified before the trial court in a separate record that she had been a prisoner in the Saginaw County Jail with Ms. Clark. Ms. Hammond was in jail as a result of a parole hold. Ms. Hammond testified that Ms. Clark told her that she had not slept for about five days before her arrest as a material witness, was about four months pregnant, and not feeling well. Ms. Hammond testified that jail personnel asked her to assist Ms. Clark with various activities of daily living, because she (Ms. Hammond) had worked as a substance abuse treatment volunteer before her incarceration and Ms. Clark needed assistance.

Ms. Hammond further testified that Ms. Clark told her that she did not want to testify in petitioner's trial, but that she had been arrested for failing to appear in court when subpoenaed. Ms. Hammond further testified that Ms. Clark told her that the detective and a prosecutor came to see her every day and that "she said that one of her cases were [sic] going to be dropped if she came to court." Ms. Hammond further testified that "[s]he said it was a breaking and entering." The break-in was at Shack's bar downtown. Ms. Hammond also testified that Ms. Clark told her she had no where to stay when she was arrested, had been using crack cocaine immediately before her arrest, and was afraid that the authorities would take her baby from her. Ms. Hammond also testified that, unlike other inmates of the jail, Ms. Clark was provided with snacks on request, a color television, and some clothes to wear to petitioner's trial.

The trial judge asked the prosecutor if there were charges pending against Ms. Clark. The prosecutor replied: "I'm not aware of a charge pending your Honor, and I'm not sure she's not going to be charged—if there's a case against her."

The trial judge [denied defense motions and] refused to allow the defendants including petitioner to impeach Ms. Clark's testimony with Ms. Hammond's testimony concerning Ms. Clarks' alleged expectation of leniency concerning breaking and entering charges against her if she testified against petitioner and his co-defendants. The trial judge also refused to allow the impeachment testimony of Ms. Chaltraw's that Ms. Clark indicated that she was being held on a breaking and entering charge or a suspect in a breaking and entering during petitioner's trial.

The trial judge did allow Ms. Hammond and Ms. Chaltraw to testify concerning the snacks, color television, and going-to-trial clothes Ms. Clark received as a material witness which other prisoners did not receive.

The jury returned its verdicts on June 7, 1994, after deliberating about three hours. As noted earlier, petitioner was convicted on the CSC, aggravated assault, and felony firearm counts, but acquitted of kidnapping and assault with intent to murder. Coeur was acquitted of all charges, and Cushman was acquitted of all charges except aggravated assault.

During his direct appeal, petitioner requested remand for a hearing concerning the breaking and entering (B & E) charges against Clark. The motion was denied, but supplemental briefs were allowed. Petitioner provided evidence that felony complaints were filed against Clark on three breaking and entering cases within about a week of the verdicts against petitioner. Two were for B & E's of a business, Shack's Lounge and Cafe Char–La, the other was for B & E of an occupied dwelling (where she stole a $300 ring and a credit card). For a first offense, the *maximum* penalties were 10 and 15 years, respectively. As a second felony habitual offender, the *maximum* penalties were 15 and 22½ years, respectively. Although not emphasized by the district court, the record indicates that all three B & E's occurred *after* the Christmas Day assault (on 2/21/94; 4/30/94; and 5/4/94). As a result, she was not a suspect or potentially motivated to lie about the assault to secure leniency at the time she was treated in the emergency room.

Ms. Clark was charged as a second felony habitual offender, pleaded guilty to two counts and was sentenced to one year in county jail (with credit for 160 days served), one year in a residential drug

treatment program, and three years probation. The record does not show which breaking and entering charge was dropped (or what happened to her pregnancy).

The prosecutor in the case against petitioner, Richard King, filed an affidavit in 1996 stating that he was aware Clark was under investigation for breaking and entering at the time of trial and may have suggested to another prosecutor that any charges against Clark be delayed until after the case against petitioner was completed. King also stated, however, that he "did not at any time suggest or imply to Christine Clark or anyone else that any consideration or benefit would or should be provided or considered for Clark in exchange for or due to her testimony or cooperation in the instant case."

Petitioner also provided an affidavit from Linda Borus, an investigator for the State Appellate Defender Office, in which she relates that Clark informed her that "although she hadn't been formally charged, she knew she had three (3) breaking [sic] charges pending because she had already confessed to ... officers from the Saginaw Police Department. She knew that the police and prosecutor would not let her get away with three (3) Breaking and Enterings."

Finally, petitioner submitted to the appellate court the police reports concerning the residential break-in by Clark, including a summary of her confession obtained during questioning on February 28, 1994. The incident notes indicate that Detective Tom Luth of the Saginaw Township Police Department transported Clark for the interview at the State Police post where she confessed. At petitioner's trial, Detective Luth testified that, to his knowledge, Ms. Clark was not currently charged with any crimes. But, he was not asked if she was under investigation for, had confessed to, or if he expected that she would be charged with any crimes in the future.

On June 13, 1997, the Michigan Court of Appeals affirmed petitioner's convictions on the merits. Petitioner's motion for rehearing and application for leave to appeal to the Michigan Supreme Court were both denied. The first two of petitioner's habeas claims were raised and exhausted on direct appeal.

The third claim of error, the claim of prosecutorial misconduct in the withholding of charges against Clark, was raised in petitioner's motion for relief from judgment. The trial court denied the motion on June 28, 1999. Finding the argument lacked merit and that there was no indication petitioner was denied a fair trial, the trial court emphasized the prosecutor's denial that any benefit was promised Clark; the fact that defense counsel tried to bring out that there were charges against her; and the fact that defense counsel used Clark's past crimes to impeach her at trial.

Petitioner's requests for leave to appeal from that decision were denied both by the Michigan Court of appeals and the Michigan Supreme Court for "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." As the district court noted, the Michigan courts' invocation of MCR 6.508(D) is sufficient to establish that the state courts are relying on the petitioner's failure to raise his claims on direct appeal as the basis for not considering the claims. *Burroughs v. Makowski*, 282 F.3d 410, 413–14 (6th Cir. 2002); *Simpson v. Jones*, 238 F.3d 399, 407–08 (6th Cir.2000). As a result, this claim was procedurally defaulted.

## II.

We review de novo the district court's decision denying petitioner habeas relief. *Bugh v. Mitchell*, 329 F.3d 496, 500 (6th Cir.2003). The AEDPA applies because

the petition was filed after its effective date. Under the AEDPA, application for writ of habeas corpus may not be granted with respect to a claim that was adjudicated on the merits unless the state court's adjudication resulted in a decision that was "contrary to" or involved an "unreasonable application of" clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1).

Except for certain errors not subject to harmless error analysis, a constitutional error that implicates trial procedures is considered harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). As clarified by *O'Neal v. McAninch,* 513 U.S. 432, 435–36, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), the court must determine whether the error itself had a substantial and injurious influence in determining the verdict. If the court finds that it did, or has grave doubt as to whether it did, the court must grant habeas relief. *Id.*

**A. Exclusion of Evidence**

The Sixth Amendment guarantees the right of the criminal defendant to confront and cross-examine witnesses and to call witnesses on his own behalf. *See Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). At the core of the Sixth Amendment is the right of every defendant to have an opportunity to effectively test the credibility of witnesses through cross-examination. *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Inquiry into bias, motive, or prejudice of a witness is

constitutionally protected. *Delaware v. Van Arsdall,* 475 U.S. 673, 679–80, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). There is no dispute that petitioner's counsel was permitted to cross-examine Clark and other witnesses about pending B & E charges or expectations of leniency.

Instead, the district court found petitioner was denied the right to present his own witnesses to establish a defense. Although the right to present relevant evidence, such as bias of the complaining witness, may bow to legitimate interests including a state's evidentiary rules, there is no dispute in this case that exclusion of the testimony from Hammond and Chaltraw was an erroneous application of MRE 613(b). *Cf. United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (exclusion of polygraph evidence under evidentiary rule did not violate right to present a defense).

▮ The district court found that improperly excluding testimony from Hammond and Chaltraw "prevented petitioner from introducing significant evidence of potential witness bias." Because the evidence would have been "material and favorable to the defense," the district court concluded that petitioner had established a violation of his constitutional rights. The government does not challenge this finding and because we agree that any error in this regard was harmless, we need not decide whether the state court's adjudication of this claim was "contrary to" or an "unreasonable application of" clearly established federal law as determined by the Supreme Court.[2]

---

**2.** *Compare Justice v. Hoke,* 90 F.3d 43, 48 (2d Cir.1996) (exclusion of extrinsic impeachment evidence violated right to present a defense) *with Harrington v. Jackson,* 1 Fed.Appx. 367, 370–71 (6th Cir.2001) (unpublished decision) ("We remain unconvinced that unearthing

bias by extrinsic evidence is 'particularly significant' or a 'fundamental element of the accused's defense,' especially in light of the fact that Petitioner had sufficient opportunity to unearth bias on cross-examination.").

Applying *Brecht*, the district court then found that exclusion of the evidence did not have a substantial and injurious effect or influence on the jury's verdicts against petitioner. Since petitioner admitted the elements of aggravated assault and felony firearm at trial, there was no reasonable likelihood that exclusion of the evidence had an effect on or influenced the convictions on those charges. As for the CSC charges, the district court concluded that even if the jurors had heard the excluded testimony from "Chaltraw and Hammond that Ms. Clark considered herself a suspect in ongoing burglary investigations and that she was testifying to obtain lenient treatment from the prosecution concerning those burglary investigations, there is no reasonable probability that [the jurors] would have been substantially more inclined to believe petitioner's testimony denying that he sexually assaulted Ms. Clark."

As the district court observed, there was forensic evidence of penetration with the beer bottle. It was petitioner's testimony that he did not force Clark to "use" the bottle on herself, but that Clark did so voluntarily in an attempt to seduce him. Clark not only testified otherwise at trial, but reported immediately after the assault that she had been forced to use the bottle on herself. To the extent that the excluded evidence would have suggested a motive to fabricate in order for Clark to secure leniency with respect to the B & E charges, that motive would not have been present on the day she was seen in the emergency room because the B & Es had not occurred and she was not yet a suspect. The verdicts of acquittal on some of the charges suggest that the jury was careful in assessing the evidence, including

Clark's credibility, and did not accept her testimony without scrutiny. We are not left with any grave doubt about whether the erroneous exclusion of the impeachment evidence had a substantial and injurious effect or influence in determining the jury's verdict on these CSC counts.[3]

On the final count of conviction, Clark testified that petitioner discovered a dollar bill in her pocket that he believed was one of the silver certificate dollar bills that had been stolen from Cushman. Part of a dollar bill was found in Clark's vagina during the pelvic examination in the emergency room. As the district court found, there was overwhelming evidence that Clark was forced to penetrate herself with part of the bill. At trial, Clark testified that Cushman forced her to do this during the extended assault and in petitioner's presence. Cushman was acquitted, but petitioner was convicted. The district court observed that the jury was properly instructed on Michigan's law of aiding and abetting.

Under Michigan law, a person may be prosecuted for aiding and abetting without regard to the conviction or acquittal of the principal. *People v. Mann*, 395 Mich. 472, 236 N.W.2d 509 (1975). To be convicted of aiding and abetting, a defendant must either possess the required intent himself or participate while knowing the co-participant possessed the requisite intent. *People v. Triplett*, 105 Mich.App. 182, 306 N.W.2d 442 (1981). The district court found there was compelling evidence both (1) that petitioner intended the sexual assault himself or knew that Cushman intended the assault at the time that petitioner gave aid and encouragement and (2) that petitioner at least aided this sexual assault by discovering the bill, accusing

---

3. In fact, Couer was acquitted of 1st degree CSC despite Clark's testimony that he inserted his penis in her mouth at gunpoint. Notably, this testimony was inconsistent with the statements Clark made to the emergency room staff on the day of the assault.

Clark of theft, and personally beating, threatening, and restraining Clark. We agree with the district court that the erroneous exclusion of the impeachment evidence did not have a substantial and injurious effect or influence on the jury's verdict on this charge.

## B. Prosecutor's Reliance on Perjured Testimony

The knowing use of perjured testimony, including the failure to correct false testimony, constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Napue v. Illinois,* 360 U.S. 264, 265–72, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). This claim encompasses use of testimony, whether elicited or left uncorrected, that the prosecutor knows or should know is false. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Agurs,* 427 U.S. 97, 103–04, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

▆ The Michigan Court of Appeals rejected this claim on the grounds "the underlying factual premise of defendant's argument, i.e. that the victim lied when she testified that she was not receiving consideration from the prosecution for her testimony, is merely an allegation." The court also denied petitioner's motion to remand because no charges had been filed against Clark at the time of petitioner's trial. Petitioner was denied leave to appeal both from the refusal to remand and the affirmance of his convictions.

In denying habeas relief, the district court found petitioner was denied an opportunity to further develop the facts and that the court was therefore not restricted by 28 U.S.C. § 2254(e)(2) from conducting

an evidentiary hearing to determine the falsity of Clark's denial that she had been promised leniency. Nonetheless, the district court concluded that no further development of the facts was necessary, explaining:

> Petitioner has shown that the prosecutor and Detective Luth knew that Christine Clark was the subject of several burglary investigations and had confessed to at least one burglary before petitioner's trial[;] that Christine Clark received a very lenient sentence upon her guilty pleas to breaking and entering charges[;] and that prosecutor King may have recommended delaying charging Ms. Clark with breaking and entering, presumably so she could truthfully testify that she had no pending charges at the time of petitioner's trial. Petitioner has not yet produced direct evidence showing that Ms. Clark was promised leniency if she testified for the prosecution at petitioner's trial. He might be able to do so, if an evidentiary hearing was held and if Ms. Clark and Kate Miller, identified in petitioner's brief as the assistant prosecutor who authorized the warrants for the breaking and enterings with which Ms. Clark was charged immediately after petitioner's trial was over, were available to testify.

However, this Court has already found that petitioner is not entitled to habeas relief on his claim regarding the exclusion of testimony of Ms. Chaltraw and Ms. Hammond tending to show bias and undermining the credibility of Ms. Clark. Consequently, even if petitioner was able to show that Ms. Clark was promised leniency if she testified for the prosecution at petitioner's trial, this claim would also not warrant habeas relief.

Assuming, as the district court did, that petitioner could show Clark had been

promised some leniency on the not yet filed B & E charges, we find there is no reasonable likelihood that the false testimony could have affected the judgment of the jury. Petitioner admitted the elements of both aggravated assault and felony firearm. There was also overwhelming evidence of penetration with the bottle and the dollar bill. Clark's credibility, including whether she had motive to fabricate or exaggerate, was relevant to the conflict in the testimony about whether Clark was forced to "use" the bottle on herself or whether Clark voluntarily did so in an effort to seduce petitioner and escape his wrath. Counsel for petitioner and his co-defendants significantly attacked Clark's credibility, including eliciting evidence of her prior inconsistent statements, her conviction for theft, and the special treatment she received as a material witness in jail. There is no reasonable likelihood that Clark's allegedly false denial of any promise of leniency on not yet filed B & E charges could have lead the jury to believe petitioner's claim that Clark had not been forced to penetrate herself with the bottle and the dollar bill.

## C. Withholding of Charges against Clark

■ This claim, that the prosecutor in petitioner's case asked that the charges against Clark be delayed, was procedurally defaulted in the state courts. As a result, habeas review is barred unless petitioner can demonstrate "cause" for the default and actual prejudice from the constitutional violation, or can demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750–51, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The district court found petitioner had presented no evidence of actual innocence that would permit review absent a showing of cause and prejudice. Although petition-

er had not argued "cause" and "prejudice," the district court decided to address the issue because petitioner was proceeding pro se.

After articulating the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and observing that an attorney assigned to represent a criminal defendant on appeal does not have a constitutional duty to raise every nonfrivolous issue, *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), the district court found petitioner was not denied effective assistance of appellate counsel by the failure to raise this claim of prosecutorial misconduct on direct appeal. The district court explained:

Appellate counsel did raise on appeal the issues that petitioner was denied a fair trial when the trial judge improperly excluded testimony of Chaltraw and Hammond concerning prior inconsistent statements made by the complainant concerning future legal jeopardy she faced for breaking and entering offenses and promises and expectations of leniency. Appellate counsel also raised the issue of whether the prosecutor and the complainant misl[ed] the jury at trial concerning these matters. Raising these issues sufficiently addressed the questions of the complainant's legal status and whether promises or expectations of leniency may have biased the complainant and whether the prosecution deliberately misl[ed] the jury regarding these matters.

Because petitioner did not argue the procedural default of this claim should be excused under the cause and prejudice standard, and because we agree that the record does not support a claim of ineffective assistance of appellate counsel that would constitute "cause" for the default,

we find habeas review of this claim is barred by procedural default.

**AFFIRMED.**